1

2

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 0:16-cv-60240-BB

4    LORENE ROCQUEL THOMPSON,

5             Plaintiff,                    February 7, 2017
                                           10:58 a.m.
6         vs.

7    NORTH BROWARD NEUROLOGY, PA,

8             Defendant.                    Pages 1 THROUGH 63

9    _____

10

11

12

13

EXCERPT TRANSCRIPT OF TRIAL, DAY 1
DIRECT EXAMINATION OF DR. BRAD DAJANI
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of 8

14   Appearances:

15   FOR THE PLAINTIFF:   ELLIOT ARI KOZOLCHYK, ESQ.
                          320 Southeast 9th Street
16                        Fort Lauderdale, Florida 33316

17

18   FOR THE DEFENDANT:   PADULA, BENNARDO, LEVINE, LLP
                          DANIEL R. LEVINE, ESQ.
19                        101 Plaza Real South, Suite 207S
                          Boca Raton, Florida 33432
20

21   COURT REPORTER:      Yvette Hernandez
                          U.S. District Court
22                        299 East Broward Boulevard, Room 207-B
                          Fort Lauderdale, Florida 33301
23                        yvette_hernandez@flsd.uscourts.gov

24

25

**I N D E X**

Certificate....................................          63

**W I T N E S S**

ON BEHALF OF THE PLAINTIFF:                              PAGE

DR. BRAD DAJANI
DIRECT EXAMINATION BY MR. KOZOLCHYK                        3

```
 1                    * * * * * * * * * *

 2         (Before the Jury, 4:03 p.m.)

 3                     DIRECT EXAMINATION

 4    BY MR. KOZOLCHYK:

 5    Q.  Dr. Dajani, North Broward Neurology is a private medical

 6    practice, correct?

 7    A.  Yes.  Correct.

 8    Q.  And you own 100 percent of North Broward Neurology,

 9    correct?

10    A.  Yes.

11    Q.  You are the only doctor at your office, correct?

12    A.  Correct.

13    Q.  Correct?

14    A.  Yes.

15    Q.  And Ms. Thompson was employed by you as a front-desk

16    medical assistant, correct?

17    A.  Correct.

18    Q.  As a front-desk medical assistant, Ms. Thompson's duties

19    included answering the phone, correct?

20    A.  Correct.

21    Q.  Included scheduling appointments?

22    A.  Yes.

23    Q.  Checking patients in?

24    A.  Yes.

25    Q.  Verifying insurance?
```

1    A.   Yes.

2    Q.   Including when patients checked in, correct?

3    A.   Yes.

4    Q.   And then sending the report to the primary physician,

5    correct?

6    A.   Yes.

7    Q.   Faxing the report was part of her duties?

8    A.   Yes.

9    Q.   Attaining lab results?

10   A.   Yes.

11   Q.   And attaining radiology reports?

12   A.   Correct.

13   Q.   Ms. Thompson's rate of pay was 12.50 per hour, correct?

14   A.   Correct.

15   Q.   And this is throughout the period of her claim,

16   February 16, 2015 to December 24th, 2015, correct?

17   A.   Correct.

18   Q.   So Ms. Thompson's overtime rate of pay would be 18.75 per

19   hour, correct?

20   A.   Correct.

21   Q.   So during Ms. Thompson's period of her claim, you employed

22   a physician's assistant named Lee Henderson, correct?

23   A.   Correct.

24   Q.   And three EEG technicians named Tina, Jody, and Arlene,

25   correct?

```
1    A.   Correct.

2    Q.   And those three EEG technicians were part-time employees of

3    yours, correct?

4    A.   Yes.

5    Q.   Also, throughout the entire period of Ms. Thompson's claim

6    from, again, February 6th, 2013 through December 24th, 2015, a

7    total of five front-desk medical assistants were employed by

8    you, correct?

9    A.   Correct.

10   Q.   But not all at the same time, correct?

11   A.   (No verbal response.)

12   Q.   At the start of Ms. Thompson's claim, it was Ms. Thompson

13   as the front-desk medical assistant, Tamika Lee, and Taneisha

14   Poitier, correct?

15   A.   Yes.

16   Q.   But Taneisha Poitier stopped working in about 2013.  You

17   terminated her, correct?

18   A.   Yes.

19   Q.   And that was about in about 2013, correct?

20   A.   Yes.

21   Q.   And you terminated her for?

22        MR. LEVINE:  Objection, relevance.

23        THE COURT:  Sustained.

24   BY MR. KOZOLCHYK:

25   Q.   And Caleb Smith, the -- was the front-desk medical
```

1    assistant and he began working in 2014, correct?

2    A.   Yes.

3    Q.   And he worked for about seven months?

4    A.   Correct.

5    Q.   And Ryan Tocarchick, he was the fifth front-desk medical

6    assistant and the final one during the period of Ms. Thompson's

7    claim, correct?

8    A.   Yes.

9    Q.   And he did not start working until September 2015, correct?

10   A.   Correct.

11   Q.   So there are various periods when, in fact, you only

12   employed two front-desk medical assistants, namely, Tamika Lee

13   and Ms. Thompson, correct?

14   A.   Correct.

15   Q.   And during some other times, you had three front-desk

16   medical assistants, correct?

17   A.   Yes.

18   Q.   North Broward Neurology's hours of operation for when you

19   received patients are 8:00 a.m. to 4:30 p.m., correct?

20   A.   The last patient, we schedule at 3:45.  But the office

21   hours are from 8:00 a.m. till 4:30.

22   Q.   Patients can come in any time between 8:00 a.m. and

23   4:30 p.m., correct?

24   A.   No.  The last appointment we schedule is 3:45 p.m. to allow

25   enough time to finish the last patient at 4:30.

1    Q.  I understand, sir.  But I'm not asking that question.  I'm

2    asking the hours of operation of North Broward Neurology.

3    A.  Yes, correct.

4    Q.  It's 8:00 a.m. to 4:30 p.m., correct?

5    A.  Yes.

6    Q.  But that does not mean work is not performed by your

7    employees outside that time period in the office, correct?

8    A.  No.

9    Q.  So work by your employees can be done before 8:00 a.m. and

10   after 4:30 p.m., correct?

11   A.  Yeah.  They're working from 8:00 to 4:30, with 30-minute

12   unpaid lunch.

13   Q.  You're referring to the hours of operation, correct?

14   A.  Yes.

15   Q.  But employees would work before 8:00 a.m. and will work

16   after 4:30 p.m., correct?

17   A.  They are not required to.

18   Q.  My question is:  Did they?

19   A.  Well, yeah, they did.

20   Q.  Okay.  All your employees have a 30-minute lunch break

21   automatically deducted, correct?

22   A.  Prior to September 2015, correct.

23   Q.  Okay.  So it's your testimony here today, before September

24   of 2015, 30-minute lunch breaks were automatically deducted?

25   A.  Correct.

1    Q.  And taking a look, while we're on that subject of

2    September 21st, 2015, you're saying from that point onward,

3    there were no automatic lunch deductions?

4    A.  This is not automatically deduction.

5    Q.  Right.

6    A.  Lorene forgot to punch her lunchtime.  So I brought her in

7    and I spoke with her.  I told her:  "I don't see your lunchtime

8    being punched."

9        She said:  "I forgot."

10       Then I said:  "Okay.  I'll do it this time for you."

11       So I did the whole week.  So this is not automatically.

12   This is she admitted that she forgot and then I fix it for her.

13   Q.  So sir, your testimony here today is from September 21st,

14   2015 to 10/13/15, she just forgot to clock out for lunch; is

15   that correct?

16   A.  Yes, sir.

17   Q.  For that entire period?

18   A.  Yes.

19   Q.  And apparently -- did she also forget to clock in for lunch

20   because the clock in time is very round numbers as well?

21   A.  Sometimes she does and she comes to me, she tell me:  "I

22   came at 8:00.  I came at 8:20."  So I fix it right away.

23       But at lunchtime during those two weeks, she didn't come to

24   me until I realized later.  Then how could she remember the

25   time that she left or she didn't leave?  So then I have to tell

1    her:  "To be fair with you, I'll deduct only 30 minutes."

2    Q.  Okay.  Sir, that's not my question.

3         My question is this:  You claim during the period of

4    September 21st, 2015 through the period of 10/3/15 -- I'm

5    sorry -- 10/16/15, that entire period, Ms. Thompson just forgot

6    to clock out for lunch day after day after day consecutively,

7    correct?

8    A.  Yes.  Those two weeks.

9    Q.  Okay.  Just day after day continuously.

10        My question is:  Then is also what you're claiming today

11   that she forgot to clock in as well, because the clock-in times

12   are extremely round numbers as well?

13   A.  No.  She comes to me right away when she comes in in the

14   morning.  If she doesn't clock or if she forgets or if she

15   has -- she tell me right away.  But for lunch, she never told

16   me.

17   Q.  No.  But I'm talking about the start of the day.

18        Is it your testimony she forgot to clock in at the start of

19   the day during this time?

20   A.  If you look at 8:00 a.m. and 8:00 a.m., 9/24 and 9/25,

21   these are the same days when she forgot to clock for lunch.

22   Q.  No.  No, sir.  I'm talking --

23   A.  I'm telling you, look at, please, at 9/24.

24        No.  They keep moving the paper.

25        9/24/2015, she clock at 8:00 a.m.  That week, she forgot to

```
 1   clock for lunch.  And then if you look at 9/25, same time,

 2   8:00 a.m. exactly, and she forgot to clock for lunch.

 3       So this is the same day.  So I -- to be fair, I told her

 4   8:00.  That's when the office starts, 8:00 there.

 5   Q.  Okay.  So, sir, are you claiming that she clocked in at

 6   these times manually?

 7   A.  Except the 8:00 a.m. and 8:00 a.m.

 8   Q.  Except the 8:00 a.m. and the 8:00 a.m.?

 9   A.  Yeah.  The 9/24 and 9/25.

10   Q.  So it's your testimony here today that right on 7:15 a.m.

11   on September 23rd, she clocked in?

12   A.  Correct.

13   Q.  And right at 7:30 a.m. on 9/22, she clocked in?

14   A.  Correct.

15   Q.  And right at 7:45 a.m. on September 21st, she clocked in?

16   A.  Correct.

17   Q.  And she clocked out right at 4:30 p.m. on September 21; is

18   that correct?

19   A.  Correct.

20   Q.  And she clocked right on the dot out at 7:00 p.m. on

21   September 22nd?

22       MR. LEVINE:  Your Honor, I'm going to have to object

23   at this point.  This was the subject of a pretrial ruling that

24   Your Honor made regarding the start and stop times, that they

25   were accurate.
```

```
1              THE COURT:  Overruled.

2    BY MR. KOZOLCHYK:

3    Q.  And right on September 23rd at 5:45 p.m., you claim she

4    clocked out right at 5:45; is that right?

5    A.  Yes.

6    Q.  So it's your testimony that all these round time entries,

7    at least the start and stop times, she literally right on the

8    dot clocked in and out September 21st through October 16th?  Is

9    that your testimony?

10   A.  I'm saying that 9/24/2015 that she forgot to punch in for

11   the lunch and for the 8:00 a.m.

12   Q.  Sir, I'm not asking you about the lunches right now.  I'm

13   talking about the start and stop times throughout the period

14   September 21st through October 16th.

15        It's your testimony, you're claiming here today under oath,

16   that these round times were all times that she clocked in and

17   out, right?

18   A.  I believe so.  But I doubt because the 8:00 a.m. and

19   8:00 a.m., they look the same to me.  And I remember on a

20   couple of days that she came to me and she said:  "I forgot to

21   punch."

22   Q.  Okay.  So other than these two 8:00 a.m.s, it's your

23   testimony here today under oath, all these other times, she

24   clocked in herself; is that correct?

25   A.  Yes, she did.
```

```
 1   Q.  I'm sorry?

 2   A.  Yes.  Yes.

 3   Q.  And it's your testimony here under oath that all these

 4   other times from 9/21/15 through 10/16/15, all these stop

 5   times:  7:30 p.m., 5:00 p.m., 6:30, 6:30, 7:15, 7:45 are when

 6   she manually clocked out; is that correct?

 7   A.  Yes.

 8   Q.  And it's your testimony here today under oath --

 9   A.  Yes.

10   Q.  -- that these 30-minute lunch breaks, all of them from

11   September 21st to 10/16/15 were all occasions she forgot to

12   clock in and out day after day from September 21st through

13   10/16/15?

14   A.  Yes.

15   Q.  Your 30-minute automatic deductions for lunches were

16   between 12:00 and 1:00 p.m., correct?

17   A.  No.  Not correct.  It can be from 12:00 till

18   1:30 sometimes.

19   Q.  You recall having your deposition taken?

20   A.  Most of the times, should be between 12:00 and 1:00, but

21   sometimes they are late.  They take late lunch sometimes.

22   Q.  Do you recall having your deposition taken on October 20th,

23   2016, starting at 9:58 a.m., sir?

24   A.  Yes.

25   Q.  And do you recall at that deposition when I asked you, on
```

1    Page 21, line 2:  "When was the unpaid lunch," do you recall

2    giving testimony, quote:

3        "Unpaid lunch, any time between 12:00 and 1:00 p.m.,"

4    period?

5    A.  Correct.  This is the regular lunch hours.

6        But as I said, if, let's say, we are late in the morning,

7    then it can be shifted from 12:00 till 1:30 or 12:30 to 1:30.

8    So there is no rigid time here because it depends.  Sometimes

9    we are busy in the morning, we're not busy in the morning.  So

10   it's not like 12:00 like go for lunch.  No.

11       So it's very flexible.  You see the hours, sometimes she

12   may take lunch at 1:20 and come back after 1:55, for example,

13   or she may take lunch earlier or the other person may start

14   earlier and the other one take lunch later.

15       So there is no specific time.  But in general, we do not

16   schedule patients from 12:00 till 1:15, 1:30, usually.  So we

17   have no patients, no activities in the office.  So they are

18   free to take lunch either 12:00, 12:30.  And if we are behind,

19   they are free to take their lunch even after.

20   Q.  Okay.  Sir, but you do remember giving testimony under oath

21   at your deposition, 10/20/16, where I asked you a five-word

22   question, very simple, straightforward:  "When was the unpaid

23   lunch?"

24       And you answered:  "Unpaid lunch, any time between 12:00

25   and 1:00."  Correct?

1    A.  Yes, correct.

2    Q.  Okay.  Your office does not close during lunchtime,

3    correct?

4    A.  No.  It's not closed.

5    Q.  It does not close from 12:00 to 1:00 p.m.  It remains open,

6    correct?

7    A.  Not to see patients, but to answer the phone, yes.  Uh-huh.

8    It's still open.

9    Q.  Well, might a patient not stop in between 12:00 and 1:00 in

10   anticipation of an appointment at 1:00?

11   A.  I mean, can happen.  Yeah.

12   Q.  It can happen, right?

13   A.  Yeah.

14   Q.  Someone needs to be there to deal with that patient,

15   correct?

16   A.  Correct.

17   Q.  Your office does not use a phone answering system or

18   service between 12:00 and 1:00 p.m., correct?

19   A.  Correct.

20   Q.  Someone needs to be there to answer the phone?

21   A.  Correct.

22   Q.  And that's because most of your patients are elderly,

23   correct?

24   A.  Most of the patients we have are elderly, correct.  And

25   they don't like to speak to an answering machine.  And some of

```
 1    them, they don't know how to speak to the answering machine.

 2    And some of them, they don't know how to leave a message.  And

 3    some of them, even if they leave a message, they don't leave

 4    their name.  They don't leave their phone number.  So that's

 5    problematic.  So we find it more convenient to take care of the

 6    patient and then have one person available in the office just

 7    to answer the phone.

 8        I'm not asking that all the employees have to be present at

 9    lunchtime or from 12:00 till 1:00.  One can eat lunch and the

10    other one can answer the phone.  And the other person, when

11    come back from lunch, then they switch, alternate.

12        And I always keep -- I try keep three employees.  I don't

13    need three employees.  Actually, I need two, actually.  But I

14    try to keep three just in case somebody takes vacations,

15    somebody gets sick.  So I still have extra person.

16    Q.  Sir, my question was only:  Your office does not use a

17    phone answering system between 12:00 and 1:00.  That was my

18    question.

19    A.  Yes.  The answer, the -- the phone still rings, yeah.

20    Q.  Because you don't use a phone answering system, correct?

21    A.  No.  No answering system.

22    Q.  And your elderly patients don't like to talk on the --

23    would not like to talk on an answering machine, correct?

24    A.  Correct.

25    Q.  Which is why you don't use an answering machine?
```

```
 1    A.  Correct.

 2    Q.  And some patients don't know how to leave a message on an

 3    answering machine, correct?

 4    A.  Correct.

 5    Q.  And, in fact, some of your elderly patients would get very

 6    upset if they received an answering message, a voice message,

 7    if they call during lunchtime, correct?

 8    A.  Correct.

 9    Q.  Which is why you don't use an answering service during

10    lunchtime?

11    A.  Correct.

12    Q.  And you personally don't like talking on an answering

13    machine, correct?

14    A.  Of course.

15    Q.  Because you never know if your call's going to be returned

16    or not?

17    A.  Correct.

18    Q.  That's why you like to have a live person available during

19    office hours, including lunchtime, to answer the phone in your

20    office, correct?

21    A.  Yes.

22    Q.  And it's, in fact, a necessity in your medical office to

23    have a live person because a patient might call with something

24    urgent that requires they speak to a live person, correct?

25    A.  Yes.
```

```
 1    Q.  You also can't close during lunchtime because there may be

 2    an emergency.  This is a medical practice, after all, correct?

 3    A.  Well, I don't do emergencies.  This is just a regular

 4    office.

 5    Q.  Okay.  Sir, do you recall at your deposition, on Page 144,

 6    lines 1 to 8, you said:

 7        "Somebody has to be available in case of emergency,

 8    answer the phone, to answer the hospital, to answer other

 9    doctors, to answer the elderly patients."

10        Do you recall giving testimony like that?

11    A.  Yes, I did.  I said:  "In case of emergency."  I didn't say

12    we see emergency patients.  We do not see emergency patients in

13    the office.  I said:  "In case of emergency."

14    Q.  Well, that's what my question was, sir.

15    A.  Yeah.

16    Q.  So you can't close during lunch because of -- in case of

17    emergencies, correct?

18    A.  Yes.  In case of emergencies.

19    Q.  Somebody needs to answer those emergency phone calls?

20    A.  Correct.

21    Q.  And those emergency phone calls could originate from

22    hospitals, doctors, and your elderly patients, correct?

23    A.  Yes.

24    Q.  And if someone doesn't answer the phone, it could ring for

25    20 times if it's not picked up, correct?
```

1    A.   Yes.

2    Q.   And no one in your office had the duty to answer the phone

3    calls, except those people that were front-desk medical

4    assistants, correct?

5    A.   Correct.

6    Q.   Only Lorene Thompson, Tamika, and the other front-desk

7    medical assistants, when they were working for, you were the

8    ones that answered the phone, correct?

9    A.   No.   There are three, like Caleb Smith, Taneisha Poitier

10   and Ryan Tocarchick, they are also involved.   So just not

11   Tamika and Lorene.

12   Q.   Sir, do you recall at the beginning of your testimony here

13   today, we covered the chronology of when these different

14   front-desk medical assistants were employed by you?

15       We've -- we established that at the beginning of

16   Plaintiff's claim, Taneisha Poitier was the third front-desk

17   medical assistant.   She stopped working.   There was a period in

18   which Ms. Thompson and Tamika were the only people working, two

19   people.   And then Caleb was another one that came in for about

20   seven months and left.   And one more time, Thompson --

21   Ms. Thompson and Tamika were the only people.

22       MR. LEVINE:   Your Honor, at this point, Counsel is

23   testifying.

24       THE COURT:   It's sustained.   Let's sharpen the

25   question, please.

```
 1   BY MR. KOZOLCHYK:

 2   Q.  Sir, earlier in this testimony, you admitted that during

 3   parts of Ms. Thompson's claim, only -- you only employed two

 4   front-desk medical assistants, correct?

 5   A.  No.  I said I need two, but I hire three.  That's what I

 6   meant.

 7   Q.  You're denying now that you employed -- during various

 8   periods of Ms. Thompson's claim that you employed only two

 9   front-desk medical assistants?

10   A.  No.  At times, I had only two because I was looking for a

11   third.  When I find the third, then I have three.  But at times

12   while I'm looking, of course, I would have two only.  But I

13   need two, but I keep one extra.

14   Q.  Ryan Tocarchick only started working for you as a

15   front-desk medical assistant in September 2015, correct?

16   A.  Correct.

17   Q.  And before that, Caleb was the third front-desk medical

18   assistant, correct?

19   A.  Correct.

20   Q.  And he was only -- he only worked there for you for about

21   seven months, correct?

22   A.  Correct.

23   Q.  So -- and before that, Taneisha Poitier stopped working for

24   you in 2013, correct?

25   A.  2014.
```

```
1    Q.  2014?

2    A.  I believe 2014.

3    Q.  Sir, you testified earlier today --

4    A.  I'm not sure.  Maybe you're right, but that's a long time

5    ago.  Maybe 2013, 2014.  I do not remember.

6    Q.  So if Ryan Tocarchick started in September 2015, and before

7    that, Caleb was a front-desk medical assistant for about seven

8    months, and before that, Ms. Poitier was the front-desk --

9    third front-desk medical assistant, and you don't recall

10   when -- it could be 2013 when she shopped working, or 2014, you

11   would agree, then, that there were more than just brief

12   intermissions in which it was only Ms. Thompson and Tamika Lee

13   whom were the only front-desk medical assistants working for

14   you, correct?

15   A.  Correct.  I'm not required -- I'm not obliged to have three

16   employees.  I need only two.  So I'm the one who decide how

17   many employees I have.

18       So if I need four, I will hire four.  If I need five, I'll

19   hire five.  So I need two, but I keep one extra.  So I'm not

20   obliged to have three, sir.

21   Q.  I understand, sir.  That wasn't my question.

22       My only point is that for significant period of times

23   during Plaintiff's claim, it was only Ms. Thompson and Tamika

24   Lee who were the active front-desk medical assistants, correct?

25   A.  Yes.  For periods of time, there were two.
```

```
1    Q.  And then no one answered the phones except for the

2    front-desk medical assistants, correct?

3    A.  Correct.

4    Q.  And no one answered when new patients entered your office

5    except the front-desk medical assistants, correct?

6    A.  Correct.

7    Q.  And that was in addition to the front-desk medical

8    assistants' other duties of scheduling appointments, verifying

9    insurance, sending reports to primary physicians, faxing the

10   report, attaining lab results and radiology reports.

11        These were all additional duties of these front-desk

12   medical assistants, correct?

13   A.  No.  You're wrong, sir.  That's her duty.  That's not

14   additional.  That's her job.  That's what she's hired for.

15   She's hired for -- to fax, to answer the phone, to schedule

16   patient.  These are not additional requirements.  That's her

17   job, sir.

18   Q.  I guess I don't understand the distinction.

19        She had to perform these duties, correct, sir?

20   A.  That's her job, correct.

21   Q.  While answering the phones, being available for

22   emergencies, and checking in incoming patients, correct?

23   A.  That's her job, correct.

24   Q.  Even during lunchtime, because you didn't close and you

25   didn't have an answering service, correct?
```

1    A.   During that period of time, she's being paid because that's

2    not considered a lunchtime because the other person is taking

3    lunch.  So that's a working period.  So she is being paid.

4    Q.   Well, how do you know so well that one is taking a lunch

5    and the other one is not?

6    A.   Well, we have enough time.  So one has to go to eat lunch

7    and the other one answer the phone.

8         Why should they both of them work, answer the phone and eat

9    lunch at the same time, and they have enough time to switch?

10   Q.   Because you had a very busy office, sir, correct?

11              MR. LEVINE:  Objection, argumentative.

12              THE WITNESS:  No.

13              THE COURT:  Sustained.

14   BY MR. KOZOLCHYK:

15   Q.   So it's your testimony here today that you know whether the

16   front-desk medical assistants were working or not during lunch?

17   A.   The only way I know, if they punch in the time or they tell

18   me that they did not eat lunch.  That's the only way I know.

19        But they know the rules.  My office -- I'm very simple

20   person.  The rules are 30 minutes per day unpaid lunch, whether

21   you use it go outside, you eat lunch, you don't eat lunch.

22   This is like a break.  You take a break, 30 minutes, that's

23   unpaid break.  But if you want to call it lunch, you can call

24   it lunch.  So she is free to do whatever she wants, if she

25   wants to eat lunch, she doesn't want to eat lunch.

1    But this is a 30-minute break, 30-minutes unpaid break.

2    That's the definition of the break lunch, but it's not -- she's

3    not required to eat lunch and I'm not checking if she eats

4    lunch or not.  That's up to her.  If she wants to eat lunch,

5    that's fine.  If she doesn't want ...

6    But if she works through her lunch period or break time,

7    then I'll pay her.  And I will be more than happy to pay her

8    because I paid her in the past and I did not deny anything.

9    But if she comes to me and she tells me that "I didn't have

10   lunch break," then I will pay her.  I don't see any reason why

11   not to pay her.

12   Q.  No one checked in patients except for the front-desk

13   medical assistants, correct?

14   A.  Correct.

15   Q.  No one answered the phones except for the front-desk

16   medical assistants, correct?

17   A.  Correct.

18   Q.  Lee Henderson, your physician's assistant, he didn't

19   perform any of the duties of the front-desk medical assistants,

20   correct?

21   A.  No.  He doesn't.

22   Q.  Your EEG technicians, they didn't perform any of the duties

23   of the front-desk medical assistants, correct?

24   A.  That's not their job, no.

25   Q.  So they didn't perform any of those, right?

1   A.  No, they're not asked.  That's not their job.

2   Q.  I know.

3       And because it's not their job, they didn't perform any of

4   those duties, correct?

5   A.  No.

6   Q.  And, in fact, they are part-time employees of yours,

7   correct?

8   A.  Correct.

9   Q.  And Ms. Thompson, as a front-desk medical assistant, she

10  worked at the front desk of your office, correct?

11  A.  Yes.

12  Q.  Where the patients entered?

13  A.  (No verbal response.)

14  Q.  And Ms. Thompson spent her 30-minute automatically-deducted

15  unpaid lunch break in the same place she worked, at the

16  front-desk, correct?

17  A.  The rule was 30 minutes unpaid lunch.  If she wants to sit

18  in the front desk or if she wants to leave, that's up to her.

19  So I don't watch them.  I don't ask them:  "What did you do on

20  your lunch break?"

21      But the rule is simple.  You get 30 minutes unpaid break.

22  That's it.  You're free to do whatever you want.  So I don't

23  watch them.  I don't tell them:  "Did you eat?"  "You didn't

24  eat?"  "Did you go out?"  "Did you leave?"

25      No.  That's up to them.  I mean, that's their break time.

1   Q.  No.  But, sir, my question was:  Ms. Thompson spent her

2   automatically-deducted 30-minute lunch break -- where she

3   actually spent it was at her front desk, right where she

4   worked, correct?

5   A.  I do not know where she spends her break time.

6   Q.  Well, then let's go back your to deposition testimony.

7   A.  Yeah.

8   Q.  Do you recall on line 26 -- on Page 26, line 13, I asked

9   you:  "Where did Lorene Thompson spend her 30-minute lunch?"

10      And your answer was:  "She used to eat lunch at the front."

11      And I asked:  "At the front where?"

12      And you answered:  "At the front desk."

13      And I asked:  "Is that where she normally worked?"

14      And you said:  "Yes."

15      Do you recall giving that testimony?

16          MR. LEVINE:  Your Honor, can he read the next question

17   and answer.  It's improper impeachment.

18          THE COURT:  The Rule of Completeness would require

19   that that be read contemporaneous.

20          If you will read the next question and answer, please.

21          MR. LEVINE:  Me?

22          THE COURT:  Mr. Kozolchyk, if you would.

23          MR. KOZOLCHYK:  Yeah.  I'm getting it right now.

24          THE COURT:  Thank you, sir.

25

```
1   BY MR. KOZOLCHYK:

2   Q.  "Did she spend her time anywhere else during her 30-minute

3   lunch break?"

4        And Mr. Levine objected to form.

5        And Mr. Dajani says then:  "As I said, I don't know because

6   when I go out to eat lunch, I don't know what they do during

7   their lunchtime.  I'm the only one in the office.  So I don't

8   have any supervisor or anybody to see what they are doing

9   during their lunchtime.  But they know where is -- they know

10  there's a 30-minute unpaid lunch.  They know the rules, and

11  whatever they want to do with their lunchtime is up to them."

12       Do you recall giving that testimony?

13  A.  Yes.  Correct.

14  Q.  And so you recall before you gave that testimony:  "Where

15  did" -- you recall giving this testimony, right -- "Where did

16  Lorene Thompson spend her 30-minute lunch?"

17       "She used to eat lunch at the front -- at the front desk,

18  where she normally worked, yes."

19       Do you recall giving that testimony as well?

20  A.  Yes.

21  Q.  Okay.  Going back to that other piece that you testified

22  regarding.  You said:  "They know the rules."

23       What rules are you referring to?

24  A.  The 30-minutes break.

25  Q.  They know that that 30 minutes gets deducted automatically,
```

```
1    correct?

2    A.  Correct.

3    Q.  And if they choose to work through that, that's on them?

4    A.  Correct.

5    Q.  Now, let's understand the layout of your office.

6         When you first enter, there's a waiting room, correct?

7    A.  Yes.

8    Q.  The back center of the waiting room is the reception area

9    where the front-desk medical assistants work, correct?

10   A.  Yes.

11   Q.  And immediately to the left of the front-desk area is your

12   personal office, correct?

13   A.  Wrong.

14   Q.  Okay.  Well, do you remember giving testimony on Page --

15   Page 62, line 25.  I asked you:

16        "So immediately to the left of the front-desk area is your

17   office; is that correct?"

18   A.  It's not immediate.  You have to walk through hallway and

19   then in the middle.  You have to walk to the left and then not

20   immediate.  Immediate would be the patients' rooms.  It's not

21   immediate.  It's to the left, but not immediate.

22   Q.  So, sir, line 25:

23        "So immediate to the left of the front-desk area is your

24   office; is that correct?"

25        And you said:  "Correct."
```

1    A.  Well, it's not immediate and she knows the office very

2    well.  She -- she worked for five years.  You can ask her right

3    now.  It's not immediate.  You have to walk through a hallway.

4    And then in the middle, that's my office.

5        Maybe I did not hear the "immediate," but it's not

6    immediate.

7    Q.  Well, it's the very first office on the left from the front

8    desk.  You're not denying that, correct?

9    A.  No.  No.

10   Q.  So you confirm it is the first office on the left?

11   A.  No.  Let me explain to you.  Let's say, for example, is

12   this reception area here.  In front of the reception area,

13   that's the patients' area.  That's where the exam rooms.  Then

14   there is a hallway here to the back.  So my office -- there's

15   another hallway to go to my office.  So you have to go to the

16   left.  That's correct.  Not immediate, but to the left.  And

17   then you have to go another hallway to reach my office.  So you

18   have to have two hallways to reach my office.

19       And I'm sure Lorene cannot -- she agrees with me because

20   she knows the office very well.

21   Q.  But that's not what you testified --

22   A.  You have Lorene in front of you.  You can ask her right

23   now:  How is my office?  Is it immediate or is it to the left?

24       You can ask her, please.

25   Q.  Well, the question was if your office was immediate and to

1    the left.  And you answered:  "Correct."

2    A.  Maybe I did not hear the question very well.  Maybe I did

3    not hear "immediate."  But I'm explaining right now to the jury

4    and to you how the office is.

5        I mean, the office is there.  Anybody can go through and

6    check the office, can take photos, if you want.  You're

7    welcome.

8        And Lorene is here.  She can explain to you if you can ask

9    her.  She tells you to how is the office later.  I'm not here

10   to argue.  I'm here just to explain how the office looks like,

11   not here to argue whether I said "immediate," "not immediate."

12       Maybe I didn't pay attention.  Maybe that day, I had like

13   full-day deposition and maybe I exhausted.  And he call me when

14   there is a hurricane and have to drive from Naples on the same

15   day of the hurricane just to go to his office.

16       I was very exhausted.  Maybe I didn't hear the word

17   "immediate."  But now I'm explaining to you how is the office

18   later.  And Lorene is in front of me and she can object if it's

19   different.  Why should I lie to you?

20   Q.  Sir, at your deposition, when you gave testimony, when you

21   said it's correct that your office is immediate to the left of

22   the front-desk, I proceeded to go further with the question and

23   I said:  "Then, moving on, what's after that?"

24       And you said:  "The kitchen, the dining room.  There's

25   another room available, which is not used, and it's for

```
 1    storage."

 2         So you literally testified not just about the location of

 3    your office being immediately to the left of the front desk,

 4    but the -- the full layout of the left-side hallway of your

 5    office.

 6         Do you recall giving that testimony?

 7    A.  I gave that testimony.  But I'm telling you right now, I

 8    was exhausted.  I came from -- you made me drive during the

 9    hurricane day.  Maybe I was not accurate.

10         But right now, you have Lorene in front of you, sir, and

11    ask her about the office.  Why do you have to ask me?  Ask her.

12    I'm here.  Ask her in front of me, please.

13         I mean, the office is there.  Anybody can welcome and look

14    at the office.  But I can send you the maps of the office, tell

15    you, if you're interested.  But what I said, definitely, that's

16    not right, because maybe I was very exhausted and it was a very

17    long deposition, the whole day, not eating lunch.  You didn't

18    give me any lunch break, nothing.

19    Q.  Sometimes you stay in the office for lunch and sometimes

20    you leave your office for lunch; is that correct?

21    A.  Yes.  Correct.

22    Q.  And normally your lunch is 30 minutes, correct?

23    A.  Approximately, 30 minutes.

24    Q.  And you take it between 12:00 and 1:00, as well sometimes?

25    A.  My lunchtime is variable.  It depends on the working day.
```

1   I don't have a specific lunchtime.  But usually around 12:15,

2   that's my lunchtime.

3   Q.  And suppose on a day -- you ever recall any day you're

4   walking out from going on your way to lunch and you see

5   Ms. Thompson working while she's eating?  Did you ever see

6   that?

7   A.  No.

8   Q.  Never once?

9   A.  Not never.  But usually I eat lunch with the -- with the

10  sales representative until they leave, until they finish.  But

11  I don't just leave and keep walking every two minutes, as you

12  said.  No.

13  Q.  So there were times that you saw Ms. Thompson working while

14  she was eating, correct?

15  A.  Yes.  Sometimes she eat, but I don't know if she's working

16  or she's not working.  But I know sometimes she eats at the

17  front.  Yes, I know.

18  Q.  Okay.  But sir, didn't you just say a moment ago that you

19  saw her sometimes working while she was eating or --

20  A.  No.  No.  I know.  I know that she eats at the front.

21  Q.  Okay.  You know that she eats at the front.  But did you

22  ever see her working while she was eating, sir?

23  A.  No.

24  Q.  You never once saw that?

25  A.  No.  I never saw working while eating, no.

1  Q.  And you don't know if the front-desk medical assistants

2  take lunch at the same time, correct?

3  A.  They are not supposed to take lunch at the same time.  We

4  have enough time for everybody to have lunch at 30-minutes

5  lunch.  They are not supposed to.

6  Q.  My question was:  Do you know if the front-desk medical

7  assistants take lunch at the same time?

8  A.  No.  I don't know.  I'm not aware if they take lunch at the

9  same time or not.

10  Q.  You were Ms. Thompson's supervisor, correct?

11  A.  Yes.

12  Q.  And there are no other supervisors at North Broward

13  Neurology except for yourself, correct?

14  A.  Yes.

15  Q.  If an employee for North Broward Neurology wants time off,

16  you must approve it, correct?

17  A.  Yes.

18  Q.  And if an employee needs to leave work early, you must

19  approve it?

20  A.  Yes.

21  Q.  And if an employee wants to come into work late, you must

22  approve it?

23  A.  No.

24  Q.  No?

25  A.  No.  I don't ask them to stay late.  They stay late and

1   then I pay them.  But they don't request.  Usually, they don't

2   request to stay late.  They don't ask me.  They just come and

3   work.

4   Q.  You review and approve the hours that your employees work

5   before they get paid, correct?

6   A.  Yes.

7   Q.  So your employees aren't getting paid for hours they worked

8   until after you've reviewed and approved it, correct?

9   A.  Correct.

10  Q.  And made automatic lunch deductions per your policy,

11  correct?

12  A.  Correct.

13  Q.  And if an employee happens to miss a time punch, only you

14  are authorized to fix it, correct?

15  A.  I'm the only one authorized to fix it, correct.  And --

16  because they cannot go back and then punch the time because

17  it's already done.  So the employee, if they forget the time,

18  they come to me, they say:  "Oh, sorry.  I forgot to punch the

19  time," then I will do it for them, ask them:  "What time did

20  you eat lunch?  What time did you come back?"

21      But if they don't even mention -- like those two weeks, for

22  example, that she didn't eat lunch, then I question her and I

23  asked her, I said:  "I'm going to be fair with you.  I'm going

24  to deduct the lunch because there is no way you can tell me

25  what time you ate lunch, what time you left for lunch because

1   how can you remember two weeks ago what time did you leave for

2   lunch or come back.  But to be fair, just 30 minutes, and I'll

3   treat you like the other employees," because the other

4   employees, they -- Tamika Lee, she punched the times correctly.

5   And Lorene, she had hard time adjusting to the new system.

6       And I understand.  So I try to help her.  But if she needs

7   help, she has to come to me and then she has to say:  "I forgot

8   to do it."  Then I'll fix it for her.  But if she doesn't, then

9   how would I know?

10  Q.  Well, there's an occasion when the entire timekeeping

11  system wasn't working for everyone and you had to go in and fix

12  it, correct?

13  A.  This happened like on one or two occasions.  But again, the

14  employees, they tell me, again, they say:  I came at, let's

15  say, 8:00 or 5:00 a.m., for example.  I ate lunch at 12:30.

16  And then when they fix the system, then I put it back.  So this

17  way, they have to -- they write it down if the system is down,

18  then I go back and then put it electronically.

19      But if they don't tell me, then it doesn't show on the

20  system.

21  Q.  Okay.  But this happened one or two times that the system

22  completely stopped working and you had to fix it, correct?

23  A.  Yes.  I mean, that happens on two occasions, yeah.

24  Q.  And this is the new timekeeping system, the one that

25  started out after September 21st.

```
1    A.  Correct.

2    Q.  So there wasn't a lot of time between September 21st, when

3    that new system came into effect, and when Ms. Thompson

4    stopped -- when her employment ended with you at the end of

5    December, correct?

6    A.  It was September, October, November, December.  Four

7    months.

8    Q.  Actually, three months.  September 21st -- September to

9    November, September/October, October to November, November to

10   December.  So three months --

11   A.  Okay.

12   Q.  -- right?

13   A.  Okay.

14   Q.  So two full breakdowns in three months is one out of three

15   hit ratio for success, right?

16   A.  Would you repeat, please.

17   Q.  If that system was operational for three months before

18   Ms. Thompson's employment ended, and the system had a complete

19   breakdown two of the three months, it's one for three, a third

20   of the time that there was a properly-functioning month in the

21   office, correct, during the time that Ms. Thompson was working

22   there?

23   A.  No.  If there is a problem, they usually write it down like

24   the old system.  They go back to the timecards, they write down

25   the times, and then they get paid.  So there's no problem here.
```

1     I mean, this happened like any Internet service.  It breaks

2    down.  And that's happened.  So -- because we use electronic

3    system, so we have to depend on the computer.  But even if it

4    breaks down, then they have to write it down on a piece of

5    paper.

6          MR. KOZOLCHYK:  Okay.

7          THE COURT:  Mr. Kozolchyk, I apologize, one of our

8    jurors does need to take a break.  We're going to take a

9    10-minute recess, please.

10    (Jury not present, 4:48 p.m.)

11         THE COURT:  It has become apparent that we do have one

12    juror that does need to take more frequent breaks than as

13    expected.  We're on a 10-minute recess.

14    (Recess from 4:49 p.m. to 5:04 p.m.)

15         MR. KOZOLCHYK:  There was an evidentiary ruling you've

16    made and I'm just trying to clarify it.  Every time I bring up

17    Taneisha Poitier and the reason for termination, it's objected

18    and sustained.  And from my perspective, they're attacking my

19    client and saying she falsely reported time and that's why she

20    was terminated.

21         And I'm trying to show, you know, chronic conduct to

22    show this acted in conformity with it and basically that he --

23    you know, he's falsely accusing multiple people of the same

24    stuff and terminating them for it.

25         So I'm trying to attack the credibility of his

1    assessment as to my client's termination by showing this is not

2    the first time that he's done this -- he's terminated an

3    employee.

4            THE COURT:  All right.

5            Response?

6            MR. LEVINE:  I'm not even sure I understand exactly

7    what he's saying, but the bottom line is I don't see how there

8    can possibly be any relevance if he were to bring in evidence

9    or testimony that Dr. Dajani terminated another employee for

10   falsifying records.

11           This is not a discrimination case.  This is not a

12   retaliation case.  You know, we're -- what, are we going to get

13   into mini trials over why Dr. Dajani terminates different

14   people?  I mean, he brought up the termination of Ms. Thompson,

15   obviously, because she's the Plaintiff in this case and it was,

16   I think, relevant to the overall claim.

17           But to bring up instances where Dr. Dajani may have

18   terminated other coworkers, whether they were for the same

19   reasons or otherwise, I don't think has any relevance

20   whatsoever.

21           THE COURT:  Mr. Kozolchyk, do you have any case law

22   that discusses chronic conduct, as you say?

23           MR. KOZOLCHYK:  I used the wrong terminology.  It was

24   Rule 406, habit routine practice, Rule 406, Federal Rules of

25   Evidence.  Basically, they are attacking my client by saying

```
 1    she falsified records, which is, you know, pretty egregious

 2    accusations.  And I want to attack the credibility of that

 3    assessment by showing, oh, look, the same assessment was made

 4    against a prior employee in the exact same position.

 5            So Federal Rule of Evidence 406.  I mean -- well, I

 6    turned off WiFi on my tablet because I was trying to get

 7    battery power.  So give me one second while I look it up

 8    elsewhere.

 9            MR. LEVINE:  Your Honor, may I respond while he's

10    looking for whatever?

11            MR. KOZOLCHYK:  I've got it right now.

12            Evidence of a person's habit or an organization's

13    routine practice may be admitted to prove that on a particular

14    occasion the person or organization acted in accordance with

15    the habit or routine practice.  The Court may admit this

16    evidence regardless of whether it is corroborated or whether

17    there was an eyewitness.

18            THE COURT:  And the purpose of introducing the reason

19    why Dr. Dajani may have fired Tamika Lee or other employees is

20    to show what, sir?

21            MR. KOZOLCHYK:  It was Taneisha Poitier.  And the

22    reason is because -- to attack the credibility of -- you know,

23    obviously, Taneisha Poitier is not here today to defend

24    herself.  And they're attacking my -- they are attacking my

25    client, saying she falsified records and trying to mix that
```

 1   with the current unpaid lunch claim.

 2          And I want to attack the credibility of his opinion

 3   that my client falsified records of her time by showing that

 4   this is not the first time he's levied such a -- you know,

 5   egregious accusations against an employee and then terminated

 6   them for the same reason.

 7          It's a pretty unusual thing to have two employees

 8   terminated with the same job role within a three-year period of

 9   time for falsifying records.  I find it pretty unusual.

10          THE COURT:  All right.

11          Anything further, Mr. Levine?

12          MR. LEVINE:  First of all, Your Honor, habit evidence,

13   as I understand it -- and I don't, obviously, have any cases

14   with me at the moment -- but habit evidence is something that

15   happens almost every day.

16          For instance, if there was an issue in this case, if

17   we were trying to say with the timecards that Dr. Dajani, every

18   single time he totaled up the hours, he did X, Y, Z.  And so

19   they wanted to bring in habit evidence to show action and

20   conformity therewith.

21          But you're talking about -- first of all, you're

22   talking about one other instance where he fired an employee,

23   which, even if the reason was having to do with falsification

24   of records, I'm quite sure it wasn't the exact same

25   circumstances.

```
 1            And I still don't understand what he's trying to bring

 2     it in to show.  He said he's trying to bring it in to attack

 3     the credibility of the Dr. Dajani.  About what?

 4            MR. KOZOLCHYK:  About his assertion that my client

 5     falsified records.

 6            MR. LEVINE:  But that's not the issue.  The --

 7     Ms. Thompson was terminated.  Okay?  We're not here to prove

 8     whether her termination was right, wrong, indifferent.  We're

 9     not here to prove whether she actually falsified those time

10     records that led to her termination.  That's --

11            THE COURT:  And let me ask, Mr. Kozolchyk, how many

12     other employees were fired for the precise reason that

13     Ms. Thompson was fired?

14            MR. KOZOLCHYK:  Let me answer that in bullet points.

15            Number 1:  I don't know, other than this one.

16            Number 2:  This is in close proximity, as it was

17     actually after Ms. Thompson started working there.

18            And Number 3:  Mr. Levine had testified -- not

19     testified -- had stated here that it was not under the exact

20     same circumstances.

21            Actually, I have Mr. -- Dr. Dajani under oath at

22     deposition saying Ms. Poitier was fired for the same reason

23     that Ms. Thompson was fired.

24            THE COURT:  At a different point in time, with regard

25     to a different issue, relating to different records, correct?
```

```
1              MR. KOZOLCHYK:  Same job role, falsifying records.

2              THE COURT:  Right.  But -- it's falsifying records,

3     but they were different records at a different point in time.

4              MR. LEVINE:  Not going to a holiday party and then

5     coming back.

6              MR. KOZOLCHYK:  There was falsifying time records.

7     Time worked.  Specifically, time worked.

8              THE COURT:  Because you're seeking to introduce the

9     reason why this other individual was fired, which is not

10    relevant, but you're seeking to introduce it as proof of habit

11    or, as you stated, the chronic conduct.

12             And the proof of habit, the sufficiency that's

13    required -- and you are the proponent of the habit evidence --

14    you have to prove the existence of a pattern of repeated

15    behavior.  And you have not satisfied that by proffering to the

16    Court that there was one other individual that may have been

17    fired for falsifying records that have nothing to do with the

18    records that Ms. Thompson may have been claimed to have

19    falsified at a separate date and time, which does not support

20    your burden of proving habit.

21             So the objection was sustained and there's no need to

22    reconsider it.

23             All right.  Let's bring forward Dr. Dajani and I would

24    suggest that we proceed for, say, 20 more minutes until 5:30.

25             Does that sound sufficient?
```

```
1              MR. KOZOLCHYK:  That's fine, Your Honor.

2              THE COURT:  Okay.

3         (Before the Jury, 5:12 p.m.)

4              THE COURT:  All right.  Welcome back, Ladies and

5    Gentlemen.  Please be seated.

6              We are going to continue with the direct examination.

7    And we'll proceed for another 15 minutes or so and then we will

8    recess for the evening.

9              Mr. Kozolchyk?

10   BY MR. KOZOLCHYK:

11   Q.  Dr. Dajani, I was in the process of asking you when we left

12   off that if an employee misses a time punch, only you are

13   authorized to fix it, correct?

14   A.  Correct.

15   Q.  And you normally see per day 19 to 20 patients; is that

16   correct?

17   A.  Normally, I see between two to 20.  Some days I see only

18   two.  And the day, I can give you exactly.  December 27, the

19   day when she work 14 hours and a half, I had only five

20   patients, five follow-ups.  And I left office at 2:00 that day.

21   Five patients only, when she worked 14 hours.

22        On December 29 -- sir, I'm giving you exact numbers.

23             MR. KOZOLCHYK:  Your Honor, he's not -- it's not

24   responsive to my question.

25             THE COURT:  Sustained.  The objection is sustained.
```

```
 1          THE WITNESS:  I'm giving you a range from two to 20.
 2   That's my answer.
 3   BY MR. KOZOLCHYK:
 4   Q.  So in response to my question about the number of patients
 5   you typically see in a day, your answer is the range of two to
 6   20; is that correct?
 7   A.  Correct.
 8   Q.  You recall at your deposition -- no, not at your
 9   deposition -- at an unemployment hearing -- do you recall
10   testifying at an unemployment hearing?
11          MR. LEVINE:  Your Honor, may we come sidebar?
12          THE COURT:  Yes.  Come sidebar, please.
13      (At sidebar on the record.)
14          THE COURT:  Mr. Kozolchyk, did we talk about not
15   referring to the nature of the proceeding and just referring to
16   a prior hearing?
17          MR. KOZOLCHYK:  If I misunderstood, then I
18   misunderstood.  This was my understanding:  That the final
19   opinion was not admissible.  But the record for impeachment
20   purposes, that testimony, that -- I'm seeking to impeach based
21   on that record.
22          THE COURT:  It's prior testimony that was under oath,
23   correct?
24          MR. KOZOLCHYK:  Right.  That's what I'm trying to do.
25   I don't care if we call it -- I don't care what we call it.  I
```

```
 1   wasn't trying to --

 2            THE COURT:  Well, you're the one that labeled it.

 3            MR. KOZOLCHYK:  It was definitely not intentional to

 4   try to -- it serves no purpose to me.  That was not the purpose

 5   of --

 6            THE COURT:  I understand.  I just don't want this to

 7   be part of this case.  That was the reason why we addressed it

 8   in a motion in limine.

 9            MR. KOZOLCHYK:  I'm in agreement with you.  I'm in

10   agreement with you.  I don't want it part of the case.  I'm

11   trying to impeach -- I'll refer to the prior proceeding.

12            THE COURT:  Is there anything further?

13            MR. LEVINE:  Now we have a bit of a problem because we

14   specifically talked about -- and it really was directed at

15   us -- the defendants, to not refer to it as an unemployment

16   proceeding.

17            Now it's out there.  Now the jury is sitting there

18   saying:  What unemployment proceeding?  I'm not looking to

19   introduce the finding at this point, but I certainly would like

20   a chance to question Ms. Thompson and simply so that the jury

21   is not sitting there wondering:  Ms. Thompson, did you file for

22   unemployment after Dr. Dajani terminated you?

23            Yes.

24            And did you receive unemployment?

25            No.
```

```
 1              That's all.

 2          THE COURT:  Well --

 3          MR. LEVINE:  He opened the door.

 4          THE COURT:  -- and let me say that certainly the

 5   reference to the unemployment proceeding inures to the

 6   Plaintiff's detriment because now the jury may be led to wonder

 7   why there was a claim for unemployment.

 8          But you brought it out, Mr. Kozolchyk.  So at this

 9   point, there really is no -- there's no cure.  Because if the

10   Court were to give a curative, it only highlights the nature of

11   the proceeding.

12          Is there any requests at this time?  With regard to

13   opening the door, I do not believe it's opened the door to the

14   finding.  It has not opened to door to anything further, other

15   than I would suggest that it be referred to "prior testimony,"

16   which is what we discussed at the hearing.

17          MR. LEVINE:  Just so we're clear -- I mean, I may not

18   get to it tonight, obviously -- but when I cross Dr. Dajani,

19   will I be permitted to ask him:  Was there an unemployment

20   claim made?

21          THE COURT:  No.  No.  And again, an unemployment

22   claim, the finding, is not relevant.  What is relevant is that

23   both of these individuals and Ms. Lee -- I forgot who the other

24   witness was.

25          MR. LEVINE:  Tamika Lee.
```

```
 1              THE COURT:  Tamika Lee -- was under oath and because

 2    it's prior testimony, it can be used for impeachment.

 3              MR. KOZOLCHYK:  And I just want to point something

 4    out, Your Honor.  I didn't even say whose unemployment hearing.

 5              THE COURT:  I understand.  And that's why I don't

 6    think that at this point there's any need to give a curative.

 7              MR. KOZOLCHYK:  And at this point, I'm only bringing

 8    it in to establish he testified there were 19 to 20.  That's

 9    the only --

10              THE COURT:  The door has not been opened.  Let's refer

11    to it as "prior testimony."

12         (End of discussion at sidebar.)

13              THE COURT:  I apologize for that white noise, Ladies

14    and Gentlemen.

15              All right.  Continuing with the direct examination.

16    BY MR. KOZOLCHYK:

17    Q.  Dr. Dajani, do you recall giving prior testimony under oath

18    that you see 19 to 20 patients per day normally, not two to 20?

19    A.  No.  I said on the deposition that day when I canceled the

20    patient, there were 19 patients on that day.  But I can show

21    you, I can prove, I have the evidence on some days -- on

22    December 29th, I had only two patients.  On December 27th, I

23    had five patients.

24         But I can see 20 patients, that's correct, yes.  But that's

25    not like a typical day.  But some days I do see 20, yes.  And
```

1   some days 18.  So it varies.  Some patients cancel.  Some

2   patient have to reschedule because sometimes the holidays.  So

3   it's not every day 20 patients.  So it varies.

4   Q.  But sir, I'm referring specifically not at the deposition,

5   but prior testimony you gave under oath on Page 17, line 2

6   where you said, and I quote, under oath:  "Normally, I see like

7   19, 20 patients a day."

8   A.  Yes.  Nineteen, 20, yes.  But sometimes I see much less.

9   Yes.  Correct.  That's what I scheduled.  But I said if they

10   cancel, they reschedule, then it goes back from 20 to six.  But

11   that's what I scheduled, correct.

12          MR. LEVINE:  I'm sorry.  Can I just get a

13   clarification on the page number.

14          MR. KOZOLCHYK:  It's Page 17, line 2.

15          MR. LEVINE:  Okay.  Got it.

16          MR. KOZOLCHYK:  Page 17, line 2.

17          MR. LEVINE:  Thank you.

18   BY MR. KOZOLCHYK:

19   Q.  You said -- and this is the full sentence, start to finish,

20   under oath:  "Normally, I see like 19, 20 patients a day."

21   A.  This is correct.  That's what I schedule, correct.  Yes.

22   Q.  But you didn't say "schedule," sir.  You say "see."

23   Normally, I see 19" --

24   A.  I have no control, sir, if they cancel or if they don't

25   cancel.  So that's what I put on the schedule, 20 patients.

48

1    But I don't -- sometimes they show up.  I see 20 patients, of

2    course.

3    Q.  Okay.  So you would agree that you normally see 19 or 20

4    patients per day?

5    A.  I don't see what's wrong in seeing 20 patients or 19

6    patients.  If they show up, yes, I will see them.  Yes.

7    Q.  Well, when I previously asked this question, you gave the

8    testimony here now two to 20.

9    A.  Yes.  Some days I have two patients.  I can -- I have the

10   dates.  I know the dates.  There are two patients.  Some days

11   it's very slow.  Some days four patients.  But I would like to

12   keep it 19, but that's not my control.

13       I cannot bring patients in and fill the schedule.  But we

14   open the schedule, 20 patients.  If they show up, I will see

15   the 20 patients.  But if they don't, or they cancel, that's

16   not -- I have no control.

17   Q.  But I'm talking about not what some days, you know, certain

18   patients cancel.  I'm talking about a normally typical day, the

19   workload of the office is 19 or 20 that you see, correct, as

20   you previously testified under oath?

21   A.  It varies, sir.  You keep repeating the same question.

22   This is not a 19, 19, 20.  It can vary from two to 20.  And I

23   repeat, it can vary from two to 20.  I have no control on the

24   schedule.  But we limit the patients number to 20.  If they

25   show up, I'll see the 20, of course.  If 19 will show up, I'll

```
1    see the 19.

2         But if only -- some days, yes, I can prove it, I had only

3    two patients.  Like December 29, I had two patients.

4    December 27 of 2015, I had only five follow-ups.

5         So it doesn't mean that I'm breaking the rule.  But I would

6    like to see 19 if I have a full schedule, of course.

7    Q.  There's a big difference between saying you see two to 20

8    patients typically per day and 19 or 20.

9         You would agree you do see typically normally 19 or 20

10   patients a day, correct?

11            MR. LEVINE:  Objection, Your Honor.  It's

12   argumentative at this point, and he's asked and answered the

13   question several times.

14            THE COURT:  Sustained.

15   BY MR. KOZOLCHYK:

16   Q.  And your office has hundreds of patients, correct?

17   A.  I don't know the exact number, sir.

18   Q.  But it's hundreds?

19            MR. LEVINE:  Objection.  He answered the question.  He

20   doesn't know.

21            THE COURT:  Sustained.

22   BY MR. KOZOLCHYK:

23   Q.  Okay, sir.

24        Well, do you recall giving testimony at your deposition

25   where I asked, on Page 66, line 20:
```

1       "Do you have more than 250 patients?"

2       And you said:  "Yes, I do."

3       And I asked you:  "Do you have more than 300 patients?"

4       And you said:  "I don't know."

5            MR. LEVINE:  Your Honor, I'm going to object and ask

6    that Mr. Kozolchyk read that entire line of questioning that

7    begins on Page 65 when he started asking the witness about the

8    number of patients he has.

9            THE COURT:  Mr. Kozolchyk?

10   BY MR. KOZOLCHYK:

11   Q.  So I asked:  "Sir, you can estimate to the best of your

12   ability -- and I'm asking you for an estimate, to the best of

13   your ability -- how many patients you have?"

14       "I do not know."

15       "I understand you don't know the exact number, but I'm

16   asking you to estimate to the best of your ability."

17       "I do not know, either."

18       "Okay.  Do you have less than 10,000 patients?"

19       "I don't know."

20       "Do you have less than a million patients?"

21       "I don't know."

22       "So you don't know if you have less than a million

23   patients?"

24       And your answer was:  "I do not know."

25       And I asked:  "Do you have more than one patient?"

```
1        "Yes, I do."

2        "More than 10?"

3        "Yes, I do."

4        "More than 20?"

5        "Yes, I do."

6        "More than 50?"

7        "Yes, I do."

8        "More than 70?"

9        "Yes, I do."

10       "More than 100?"

11       "Yes, I do."

12       "More than 150?"

13       "Yes, I do."

14       "Do you have more than 200 patients in the total number of

15   patients?"

16       "Yes, sir.  Yes."

17       "So you have more than 250 patients?"

18       "Yes, I do."

19       "Do you have more than 300 patients?"

20       "I don't know."

21       So, sir, you would agree you have more than 250 patients,

22   correct?

23   A.  I have more than 250 patients, yes.

24   Q.  Ms. Thompson worked past 4:30 almost every day, correct?

25   A.  Yes.  I can see every day, yes.  Almost every day.
```

```
1    Q.  And even with the new timekeeping system provided by First

2    Choice Neurology, which permits employees to clock in and out

3    for lunch, your employees were still required to notify you

4    verbally if they are going to work through a lunch, correct?

5    A.  Yes.

6    Q.  And the reason is because you have automatic 30-minute

7    deductions, correct?

8    A.  The reason, they have 30 minutes break time during the day.

9    If they use it, they have to report it.

10   Q.  Because you have an automatic 30-minute deduction even with

11   the new system under First Choice Neurology, correct?

12   A.  Yes.

13           MR. LEVINE:  Objection.  Asked and answered several

14   times.

15           THE COURT:  Overruled.  I'll allow it.

16   BY MR. KOZOLCHYK:

17   Q.  Even under First Choice Neurology, you still maintain the

18   same 30-minute automatic deductions for lunch, correct?

19   A.  Correct.  It's 30 minutes unpaid lunch, yes.

20   Q.  And they have to clock -- your employees have to clock in

21   and out for 30 minutes.  If they don't --

22           MR. KOZOLCHYK:  Actually, Your Honor, may I go to

23   sidebar for a moment?

24           THE COURT:  All right.  Come on forward.

25       (At sidebar on the record.)
```

```
 1            THE COURT:  May I see what you are referring to?

 2            MR. KOZOLCHYK:  I want to make sure I'm not opening

 3      the door to anything.  So if Dan Levine accuses me of -- that I

 4      have to read the whole transcript, I don't want to read the

 5      whole transcript.  So I want to avoid that.

 6            "It's considered cheating.  It's considered cheating

 7      if they don't report the 30 minutes," and that he refers to it

 8      here, it's considered cheating, with the very next few lines, I

 9      definitely don't want going in.

10            THE COURT:  What are the next two lines?  I mean,

11      would it make the testimony complete?

12            MR. KOZOLCHYK:  Talks about unemployment.  Talks about

13      unemployment, and it's totally --

14            THE COURT:  Let me read it.

15            MR. KOZOLCHYK:  It totally goes on a tangent that

16      wasn't even responsive to my question.  This is relevant

17      testimony right here that I'm going to impeach with if he

18      denies it, and I don't --

19            THE COURT:  How was the time --

20            MR. KOZOLCHYK:  This part isn't even responsive to my

21      question, the part that I don't want.

22            THE COURT:  Right.  So what part -- you're seeking to

23      have in the cheating part?

24            MR. KOZOLCHYK:  Right above it.

25            THE COURT:  But it's the complete answer.  What you're
```

1    referring to is you're taking pieces of what is a complete

2    answer.

3              MR. KOZOLCHYK:  It's not in response to my question.

4              THE COURT:  I understand it's not responsive, but you

5    can't pick pieces of testimony.  You have to give the full.

6    That's what's that the Rule of Completeness requires.

7              MR. KOZOLCHYK:  So I'll withdraw the question, then.

8              THE COURT:  All right.  Then let's continue.

9         (End of discussion at sidebar.)

10   BY MR. KOZOLCHYK:

11   Q.  Okay.  Dr. Dajani, you had two different timekeeping

12   systems during the period of Ms. Thompson's claim, correct?

13   A.  Correct.

14   Q.  The first period, you used timecards, correct?

15   A.  Correct.

16   Q.  And during the first period, the front-desk people would

17   handwrite the time in and time out on the timecards?

18   A.  Yes.  What they do, they write down the time they come in,

19   the time they leave, they put the dates.  And then at the end

20   of the two weeks before the paycheck, then I add the hours.

21        After I add the hours, I give it back to the employee.

22   They review it.  They fax it to the accountant.  And if I don't

23   hear any response, it means they agree with it and then they

24   get paid.  But I don't send it to the accountant without

25   letting the employee read it.

```
 1        So after I add the hours, I give it to the employee.  They

 2   fax it to the accountant.  So the employee look at the hours,

 3   they agree with it, and then they fax it.  It's not something

 4   that I put --

 5             MR. KOZOLCHYK:  Your Honor --

 6             THE WITNESS:  -- I add the hours or something.  So

 7   they put the hours.  I add the hours and that's the procedure.

 8   And then they take it, they fax it.

 9   BY MR. KOZOLCHYK:

10   Q.  Sir, my question is:  You total the time at the bottom of

11   each timecard, correct?

12   A.  I add the hours at the bottom, yeah.

13   Q.  At the bottom.  That's your handwriting at the bottom of

14   the timecards, correct?

15   A.  Correct.

16   Q.  And when you add the time at the bottom of the timecard,

17   you don't just add the time entries, you add the time entries

18   and then subtract approximately 30 minutes each day for the

19   automatic lunch break.  And that's the number after you

20   subtract the 30-minute lunch break that's at the bottom as the

21   total, correct?

22   A.  Correct.  But if you see, if you look at all the numbers,

23   they don't have decimals, like 42.8, 43.2, because all the

24   employees, they know we round the numbers.  That's why you saw

25   some differences like 20 minutes, 20 -- because if they, let's
```

1   say, work 10.31 hours, so I give them 11, extra.  If they work

2   less than 10.30, then I round it below.

3       So this way -- I don't like to use the decimals.  So in

4   case they work over 31 minutes, then they get the full hour

5   paid extra.  So it's sometimes they work less, sometimes they

6   work more.  They are aware of the rules.

7   Q.  Now, sir, I'm not asking about the decimals.  I'm asking

8   about when you add the time on each timecard.  We're talking

9   about the first timekeeping system.

10      You know which timekeeping system I'm talking about, right?

11  A.  Yes.

12  Q.  So during the first timekeeping system, which consumes the

13  majority of Ms. Thompson's claim, there are these handwritten

14  timecards.

15  A.  Correct.

16  Q.  And Ms. Thompson would write the start and stop time each

17  day on the timecard, correct?

18  A.  Correct.

19  Q.  And then you would go and take the timecard, you would add

20  up the start and stop time each day.  You would add up those

21  hours and you would subtract about 30 minutes for each day

22  worked for these automatic lunch deductions.  You would do that

23  yourself, correct?

24  A.  Yes.  But on some occasions, not the other employees, just

25  Lorene, she adds her hours.  And if you see some of them, I

1    just go back and add it again.  But she adds her hours.  She

2    used to add her hours.

3    Q.   That's not what my question is.

4         You add the time at the bottom of each of these handwritten

5    timecards after subtracting 30 minutes per day for automatic

6    lunch breaks.

7    A.   Correct.

8    Q.   So that number at the bottom is -- first, it's your

9    handwriting because you wrote it, and it's after the 30 minutes

10   are deducted each day, correct?

11   A.   Yes.

12   Q.   And then that sum total on each week is what you use to

13   process payroll and pay your employees, including Ms. Thompson,

14   correct?

15   A.   Yes.

16   Q.   Do you ever check with any employee to see if they worked

17   during -- for this time that you're automatically deducting?

18   A.   What do you mean, "check with the employee"?

19   Q.   Do you ever check with the worker -- with the employee and

20   say:  "Hey, did you really work this time?  Did you really take

21   a lunch during this time," or do you just assume --

22   A.   No, I don't.  I don't ask him.

23   Q.   Excuse me.  Let me finish my question, please.

24        Do you just assume that they took their lunch for 30

25   minutes each day?

1   A.   I assume if they don't report it, if they don't tell me

2   they did not use it or if they worked.  But -- so I assume

3   because that's the rule that you have 30 minutes unpaid lunch.

4        Unless they write it and they say "no lunch," then I pay

5   them.  If they work 15 minutes, I pay them 15 minutes.

6        But how would I know if they don't tell me?  And if they

7   don't mention, the only way I will know if they write down "no

8   lunch," then I pay that.

9        I have no problem with paying them if they tell me.  But if

10  don't tell me, I cannot just walk to the front every two

11  minutes, see if they work, they don't work.  And if they answer

12  the phone, what they are doing.  I have patients to see.

13  That's not my job just to look at that the employees, if they

14  eat lunch, they don't eat lunch.

15       My rules are simple.  This is a small office, as Ms. Lorene

16  said -- she kept saying.  This is a small office and the rules

17  are very simple.  We don't have complicated contracts,

18  agreements, policies.  Very simple rules.  Like 30 minutes

19  unpaid lunch.  You claim the time in/time out.  You get paid.

20  That's it.  If you want to work overtime, I'll pay you.

21       I don't question them.  I don't ask them to do extra work,

22  nothing.

23  Q.   Sir, in your small office, you're the supervisor.  You're

24  the manager.  You know what the front-desk medical assistants'

25  job duties are.  You know what they do and you're telling us

1  you don't know if they are performing work during lunch?

2  A.  No.  I don't know what they do during the lunchtime because

3  during the lunchtime, we have no patients from 12:00 roughly to

4  1:00, 1:15.  We have no -- no patients, no patient activity.

5     So I don't know what they do during the lunch when I'm

6  outside eating lunch.  So I don't know what they do.  So I

7  don't check.

8     Why don't they tell me if they don't -- if they work

9  through the lunch?  So why do I have to go there and then check

10  the employee?  Did you eat lunch?  You didn't eat lunch?  Are

11  you using the phone?

12       THE COURT:  Mr. Kozolchyk, just let me know when it

13  might be a good time to break for the evening.

14       MR. KOZOLCHYK:  I don't want to keep the jury any

15  later this evening than necessary.

16       THE COURT:  Would this be a good time, sir?

17       MR. KOZOLCHYK:  Yeah.

18       THE COURT:  All right.

19       Ladies and Gentlemen, we are going to recess for the

20  evening.  As I did advise you, tomorrow will be a half a day.

21  It will be from 9:00 to 12:30.  So I would ask that you perhaps

22  have a late breakfast or bring in some snacks, since we are

23  going to proceed right till 12:30.

24       Let me give you further instructions.  That is, you

25  are not to talk to anyone about the case or let anyone talk to

1   you about the case.  You're not to do any independent research.

2   Everything learned about the case is learned within this

3   courtroom.

4           Please remember that you do need to be on time.  We

5   cannot get started unless all of you are here.  So we'll start

6   precisely at 9:00 .

7           Have a pleasant evening.  I'll see you tomorrow

8   morning at 9:00 a.m.

9       (Jury not present, 5:37, p.m.)

10          THE COURT:  Okay.  Dr. Dajani, go ahead and have a

11  seat.

12          Are there any issues that we need to address before we

13  recess for the evening?

14          On behalf of the Plaintiff?

15          MR. KOZOLCHYK:  No, Your Honor.  Thank you.

16          THE COURT:  On behalf of the Defendant?

17          MR. LEVINE:  Just briefly, Your Honor.  It's merely to

18  preserve the record.  I would like to either call Ms. Thompson

19  or Dr. Dajani to ask about the unemployment, since it was

20  brought up by Mr. Kozolchyk and the jury may very well be

21  wondering what that's all about.

22          My questions that I would simply like to ask is:  Did

23  Ms. Thompson file an unemployment claim and did she receive her

24  unemployment, period.

25          THE COURT:  The objection is preserved.  The Court has

```
1    already ruled the door has not been opened --

2          MR. LEVINE:  Thank you, Your Honor.

3          THE COURT:  -- and that will not be permitted.

4          Mr. Kozolchyk, following the testimony of Dr. Dajani,

5    are there other witnesses that will be called tomorrow?

6          MR. KOZOLCHYK:  They were subpoenaed.  I don't see

7    them here.  So it doesn't seem that they will be showing up.

8          THE COURT:  I would merely ask that if there are

9    additional witnesses that you have those witnesses here and --

10   and ready to be called.

11         MR. KOZOLCHYK:  I understand.  They were supposed to

12   be here at 1:00 p.m. today.  That's what the subpoena provided

13   for.  I don't know what happened.

14         THE COURT:  And once again, I would only ask that we

15   don't have a gap in time, since we're only proceeding till

16   12:30 tomorrow.

17         MR. KOZOLCHYK:  Okay.  I understand.  Thank you, Your

18   Honor.

19         THE COURT:  Okay.  All right, then.

20         Since the courtroom is going to be locked, you are

21   free to leave your items here.  There's no one that's going to

22   come in other than the court security officer to do a sweep in

23   the morning, and the courtroom will be open a few minutes

24   before 9:00.

25         Okay.  If there's nothing further, have a pleasant
```

1    evening.  I'll see you tomorrow morning at 9:00 a.m.

2              (Proceedings adjourned at 5:39 p.m.)

Yvette Hernandez, Official Court Reporter

299 East Broward Boulevard, Room 207-B

Fort Lauderdale, Florida 33301

(954) 769-5686

1    UNITED STATES OF AMERICA      )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5          I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 7th

9    day of February, 2017, in the above-mentioned court; and that

10   the foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13   1 - 63.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15   Fort Lauderdale, Florida this 8th day of February, 2017.

16

17                      /s/Yvette Hernandez
                        Yvette Hernandez, CSR, RPR, CLR
18                      Certified Shorthand Reporter
                        299 East Broward Boulevard
19                      Room 207-B
                        Fort Lauderdale, Florida 33301
20                      (954) 769-5686
                        yvette_hernandez@flsd.uscourts.gov
21

22

23

24

25